NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| *In re Application of* YAEL PERRY Petitioner, For the Issuance of an Order Pursuant to 28 U.S.C. § 1782 for Discovery in Aid of Foreign Proceedings. | **Civil Action No. 25-15508-JXN-AME** **OPINION and ORDER** |

**ESPINOSA, U.S.M.J.**

This matter comes before the Court on the motion filed by respondent Michael Jacob ("Jacob") to quash a document subpoena and to vacate the Court's November 25, 2025 Order authorizing the issuance of that subpoena pursuant to 28 U.S.C. § 1782 [D.E. 26]. Petitioner Yael Perry ("Perry") opposes the motion.[1] The Court considered the papers filed and heard argument on the motion on September 30, 2026. For the following reasons, the motion is granted in part and denied in part.[2]

[1] This Opinion will refer to the petitioner as simply "Perry," whereas other individuals sharing her surname will be identified by full name. However, in the relevant foreign proceedings, she is consistently referred to as "Yael" to distinguish her from other members of the Perry family.

[2] The Section 1782 petition was referred to this Court by the Hon. Julien X. Neals, U.S.D.J., pursuant to 28 U.S.C. § 636(b). The Third Circuit has noted the majority of district courts treat Section 1782 orders as non-dispositive. *See Arcelik A.S. v. E.I. Dupont De Nemours and Co.*, 856 F. App'x 392, 396 n.6 (3d Cir. 2021) (citing *In re Hulley Enters. Ltd.*, 400 F. Supp. 3d 62, 71 (S.D.N.Y. 2019)). *See also In re JSC United Chem Co. Uralchem*, Civ. No. 20-3651, 2021 WL 2660205, at *2 (D.N.J. June 29, 2021) (reviewing Magistrate Judge's decision on a Section 1782 application under a clearly erroneous standard, observing that "[t]he Third Circuit has not decided whether Section 1782 motions for discovery are dispositive, but a majority of out-of-district decisions have found that such rulings are not dispositive and therefore subject to review only for clear error.") (cleaned up). Accordingly, following the majority approach, this Court entered the November 25, 2025 Order and now decides this motion to quash.

# I. BACKGROUND

This matter concerns Perry's effort to obtain discovery for use in a lawsuit she is pursuing in Curaçao's Court of First Instance (the "Curaçao Court") captioned *Yael Perry v. The Solid Fund Private Foundation, Solid Holding N.V., and Tamar Perry*, for damages Perry claims she sustained due to alleged malfeasance affecting her inheritance (the "Curaçao Damages Proceeding"). *See* Decl. of Yael Perry, at D.E. 1-3 ("Perry Decl."), ¶ 2. The Curaçao Damages Proceeding is one of several actions, now or previously pending, related to a multi-year, international dispute between and among the heirs of Israel Perry over the distribution of his estate's assets. That one-billion-dollar estate distribution plan consists of a complex network of trusts and entities, including the Liechtenstein Lake Cauma Trust ("LCT") and the LCT Trust Structure. *Id.* ¶ 3. Relevant to this motion, the beneficiaries of the LCT Trust Structure include Israel Perry's daughters, Perry and her sister Tamar Perry, and their now-deceased mother Lilly Perry. *Id.*

## A. The Foreign Proceedings

The Curaçao Damages Proceeding and several related actions in the Curaçao Court concern the alleged dissipation or unlawful transfer of shares of one of the companies within the LCT Trust Structure, Solid Holding N.V. ("Solid"), and Jacob's roles as an officer of Solid and a director of Solid's holding company. *Id.* ¶ 6 and Ex. 1 ¶¶ 11, 16. Previously, Solid was owned almost entirely by Britannia National Company Insurance Company, now known as Britania National Company ("BNC"). *Id.* ¶¶ 7-8. However, on May 24, 2017, a new entity known as The Solid Fund Private Foundation ("SFPF") was formed in Curaçao, and through Solid's issuance of new shares to be held by SFPF, BNC's ownership in Solid was reduced to less than one percent. *Id.* Perry was not involved in that transaction but states she was informed that SFPF's

formation and its acquisition of Solid was purportedly intended to protect the LCT Trust Structure's assets from improper use by the LCT trustees. *Id.* SFPF's two directors are Jacob and Neil Duggan, and its beneficiaries include Perry, her sister Tamar Perry, and Tamar Perry's children. *Id.* ¶ 7 and Ex. 1 ¶¶ 11, 16. Solid's primary assets consist of two investor accounts, with combined balances of over $250 million, maintained with Banque Pictet & Cie S.A. (the "Pictet Accounts"). *Id.* ¶ 9.

In early 2025, Perry became aware of two agreements she asserts negatively impact her expected distributions from the LCT Trust Structure, specifically her interest in the Pictet Accounts as a beneficiary of SFPF. *Id.* ¶¶ 12-13. First, she learned that on December 31, 2024, Tamar Perry, Lilly Perry, and trustees formerly involved in the LCT Trust Structure entered into a Master Settlement Agreement ("MSA") meant to resolve their various disputes concerning the division of LCT Trust Structure assets. *Id.* ¶ 12.[3] In her Declaration in support of this Section 1782 application, Perry asserted that the MSA and its details had been withheld from her, but she is aware that its implementation will transfer the Pictet Accounts' funds from Solid and SFPF to other estate beneficiaries' personal trusts. *Id.* ¶ 13. Second, in March 2025, after she filed a proceeding to enjoin Solid and SFPF from transferring funds under the MSA, Perry received a copy of another agreement among Solid, SFPF, and BNC, also entered into on December 31, 2024 (the "BNC Agreement"). *Id.* ¶ 14. According to Perry, the BNC Agreement likewise threatens her interest as a beneficiary of the LCT Trust Structure as it relates to Solid's and SFPF's assets. *Id.* ¶ 15. Specifically, she asserts the BNC Agreement provides that SFPF will transfer all its shares of Solid, valued at approximately $145 million, to BNC for a symbolic purchase price of 1 Euro. *Id.* Ex. 1, ¶ 43.

[3] In her early filings here and in the Curaçao Court, Perry referred to this document as the "Global Settlement Agreement." Later, she obtained a copy of the agreement and now identifies it as the MSA.

These two agreements and the transactions they cover are at the core of the various underlying Curaçao proceedings initiated by Perry, as follows:

1. <u>The Summary Proceeding</u>

On February 6, 2025, Perry initiated a preliminary relief proceeding against Solid and SFPF related to the transaction at issue in the MSA (the "Summary Proceeding"). *See* Decl. of Susan M. Kennedy, at D.E. 26-2 ("Kennedy Decl."), Ex. 1. The Summary Proceeding did not seek to litigate substantive claims but rather was limited to two discrete requests: (1) to freeze the transfer of funds held in the Pictet Accounts and otherwise prohibit Solid and SFPF from moving assets in the LCT Trust Structure and (2) to compel Solid and SFPF to turn over a broad range of documents. *Id.* Ex. 1 at 1-2. Among other documents at issue in the Summary Proceeding, the request included:

> copies of agreements (including appendices) concluded between September 1, 2024 and the date of the judgment rendered in this case that relate to (i) moving assets from SFPF and/or Solid and/or from within the trust structure, which LCT or its legal successors are part of (the Trust Structure) and (ii) other changes to the Trust Structure ….

*Id.* Ex. 1 at 5. In other words, subsumed within that request are the MSA and BNC Agreement and their annexes.

By Order of March 28, 2025, the Curaçao Court denied the relief sought in the Summary Proceeding (the "March Decision"). *Id.* Ex. 1 at 9. The March Decision stated, in relevant part, that Perry had failed to establish a basis for obtaining the requested documents under Curaçao's applicable discovery rule, Article 843a. *Id.* As set forth in the March Decision, the Curaçao Court reviewed the requirements of Article 843a, which include a demonstration that the requesting party have a legitimate interest in the records and that the documents concern a legal relationship of that party, and concluded that Perry's basis for her document request was too

speculative to satisfy the rule. *Id.* Further, the Curaçao Court observed that although Perry "suspects that she is being sidelined by [her fellow beneficiaries]" and "links this [harm] to an alleged insufficient representation by the Executive Board of Solid or SFPF of her interests," she had not substantiated such assertions "in the context of these preliminary relief proceedings" sufficient to warrant her "far-reaching" request for information. *Id.* Ex. 1 at 10. Perry appealed the March Decision on April 22, 2025, and that appeal remains pending.[4] *See id.* Ex. 2; Decl. of Sebastiaan H. Barten, at D.E. 36-1 ("Barten Decl."), ¶¶ 5-6, 13; Kennedy Decl. ¶ 3.

2. <u>The Curaçao Damages Proceeding</u>

On June 24, 2025, Perry filed the Curaçao Damages Proceeding, the foreign proceeding which directly underlies her application in this Court for discovery under Section 1782. *See* Perry Decl. Ex. 1 at ¶ 1; Barten Decl. ¶ 7. In that action, she asserts merits-based claims against SFPF, Solid, and Tamar Perry to recover upwards of $50 million in damages she states she will incur as result of the allegedly unlawful transfer of Solid's shares from SFPF to BNC under the BNC Agreement, which she alleges is part of the MSA. Perry Decl. ¶ 6 and Ex. 1 at ¶ 91. Perry became aware of the BNC Agreement when, immediately before the March Decision was issued, SFPF voluntarily provided her a copy, albeit without the BNC Agreement's attachments or related documents referred to as "annexes." Perry Decl. ¶ 14.

In the Curaçao Damages Proceeding, Perry alleges, generally, that SFPF, Solid, and Tamar Perry engaged in a conspiracy to deprive Perry of assets to which she is entitled and divert them to Tamar Perry. *Id.* Ex. 1 ¶¶ 1-9. She alleges that their deceptive conduct was executed by means of the BNC Agreement and MSA, which she asserts are intended to transfer

[4] Although Perry's Section 1782 application to this Court stated she had initiated the Summary Proceeding, it did not disclose that the Curaçao Court had ruled against her request for documents from SFPF and Solid. *See* Perry Decl. ¶ 14.

the balance of the Pictet Accounts to all SFPF beneficiaries excluding Perry. *Id.* Ex.1 ¶ 73. Specifically, she claims that by entering into the BNC Agreement without the approval of all beneficiaries, SFPF violated its articles of association. *Id.* Ex. 1 ¶¶ 63-64. She also claims that entry into the BNC Agreement breached a 2023 settlement agreement, known as the VSO, by and between Perry, Tamar Perry, SFPF, and Solid concerning the division of assets in Solid and SFPF. *Id.* Ex. 1 ¶ 80. In addition to its substantive claims for relief, the Curaçao Damages Proceeding asserts a demand for production of the MSA under Section 843a. *Id.* Ex. 1 ¶ 102.

3. The Director Dismissal Action

On September 1, 2025, Perry filed a third action in the Curaçao Court, seeking dismissal of SFPF's directors Jacob and Duggan from their positions and amendment of SFPF's articles of incorporation. Barten Decl. ¶ 6; Kennedy Decl. Ex. 3. Those requests were denied on December 15, 2025 (the "December Decision"). Barten Decl. ¶ 6; Kennedy Decl. Ex. 3. The December Decision concluded that, although SFPF had excluded Perry from significant transactions and deprived her of valuable information, the SFPF directors' conduct, in particular as it pertained to SFPF's entry into the BNC Agreement, did not amount to mismanagement warranting their removal. Kennedy Decl. Ex. 3 at 6-7.

However, the December Decision was replete with sharp language concerning SFPF's "lack of transparency and unequal treatment of Yael." *Id.* Ex. 3 at 6. It noted that, despite Perry's reasonable requests for information potentially bearing on her share of benefits from the LCT Trust Structure, "[t]he Executive Board of SFPF [had] seriously failed on this point." *Id.* at 7. The Curaçao Court rejected the mitigating effect of the Summary Proceeding, stating: "The comment that Yael did become sufficiently informed via the preliminary relief proceedings she filed is not only a joke, but almost invites her to conduct further proceedings,

which is in the interest of neither party. Stopping the provision of information understandably leads to that [sic] Yael becomes suspicious and escalates the relationships even further." *Id.* In denying Perry's request to remove Jacob and Duggan, the Court admonished them for their "deliberate structural exclusion of Yael from information around the Solid VSO [the BNC Agreement]" and pointedly stated that "it may be assumed that this [Yael's exclusion] would no longer occur after taking note of this decision." *Id.*

4. <u>The Appeal</u>

Perry appealed from the December Decision, and the Curaçao Court of Appeal consolidated that appeal with her earlier-filed appeal of the March Decision. Barten Decl. ¶¶ 5-6. On June 16, 2026, an oral hearing on the consolidated appeal was held. *Id.* ¶ 10. SFPF and Solid appeared through counsel, and Jacob and the interim director of Solid were also present. *Id.* Ex. A at 2. The Curaçao Court of Appeal deferred decision to give the parties an opportunity to negotiate a resolution and, to facilitate that process, expressly encouraged SFPF to voluntarily disclose information and documents. Barten Decl. ¶ 10 and Ex. A at 9-10. The Court of Appeal remarked: "It is certainly possible to raise legal objections regarding the Section 843a claim, but what's the harm in giving those documents to Yael?" *Id.* Ex. A at 9. The Court also requested that Solid's interim director provide a status update "regarding a settlement and whether the documents in question can be released to Yael." *Id.* Ex. A at 11. In anticipation of status updates, a decision on the consolidated appeal of the March Decision and December Decision was postponed twice, most recently to October 6, 2026, but it appears that no progress had been made through private discussions. *Id.* ¶¶ 11-14. To date, the appeal remains pending.

### B. Perry's Section 1782 Application

On September 11, 2025, Perry initiated this action by filing a motion for issuance of a subpoena in aid of a foreign proceeding, upon *ex parte* application, pursuant to 28 U.S.C. § 1782. In support of her motion, Perry stated that Jacob, a resident of New Jersey, possesses information and documents relevant and indeed essential to her claims in the Curaçao Damages Proceeding. According to Perry, in his capacity as one of SFPF's two directors and an officer of Solid, Jacob personally witnessed and participated in the communications, negotiations, and creation of both the MSA and BNC Agreement. Pet. Mem. at 7, at D.E. 1-2. She identified Jacob as the "primary custodian" of documents relevant to those agreements and to her claims concerning the allegedly improper transfer of assets to BNC and asserted that the material she seeks is maintained in Jacob's personal files, including email accounts, located in New Jersey. *Id.* at 7, 9.

Although authorized to consider Perry's motion for discovery *ex parte*, *see* 28 U.S.C. § 1782, the Court instead entered an Order directing Perry to serve the motion on Jacob and providing him an opportunity to oppose her discovery request by November 10, 2025.[5] *See* Oct. 20, 2025 Order, D.E. 8. As that Order reflects, the Court required the motion be pursued on notice in view of its concerns that, while Perry's application met the statutory requirements, a response from Jacob might help illuminate discretionary considerations applicable to requests for discovery under Section 1782. *See id.* However, Jacob failed to respond by the deadline.

By Order entered November 25, 2025, the Court granted Perry's unopposed request for issuance of a subpoena on Jacob to produce the documents listed in Exhibit A to the Order (the "Jacob Subpoena"). The Jacob Subpoena seeks, among other things, the complete BNC

---

[5] A similar approach on notice to the respondent was followed by this District in *In re Frasers Group PLC*, Civ. No. 23-22795, 2024 WL 139488, at *1 (D.N.J. Jan. 12, 2024).

Agreement (including annexes) and related transfer instructions; the complete MSA (including annexes) and related transfer instructions; and email correspondence between Jacob and SFPF beneficiaries other than Perry. *See* Nov. 25, 2025 Order, D.E. 14, Ex. A. The November 25, 2025 Order held that Perry satisfied the minimum statutory requirements under Section 1782 and made a prima facie demonstration that the discovery was warranted as a matter of the Court's discretion. It further noted Jacob was not precluded from later challenging the discovery upon motion to quash.

Thereafter, Perry and Jacob engaged in private meet-and-confer sessions in an effort to narrow the Jacob Subpoena's scope. They reached an impasse and sought the Court's assistance by dispute letters filed January 26 and February 10, 2026. Those letters informed the Court that Perry had, by other means, obtained some of the material sought in the Jacob Subpoena—significantly, a copy of the MSA was attached to a petition filed by the LCT Trust Structure in the Princely Court of Liechtenstein—and thus offered to narrow her discovery demand to six discrete documents, but Jacob rejected that compromise on various grounds. On March 4, 2026, the Court held a telephonic conference to address the parties' preliminary arguments and encouraged them to continue their efforts to negotiate a resolution concerning the Jacob Subpoena but provided leave to bring a motion if they were unable to do so.

On March 27, 2026, Jacob filed this motion to quash.

## II. Discussion

### A. Legal Standard

Under 28 U.S.C. § 1782, a federal district court may order that discovery be provided in aid of a foreign proceeding. *See Intel Corp. v. Advanced Micro Devices Inc.*, 542 U.S. 241, 255 (2004). The applicant for domestic discovery in aid of a foreign proceeding must establish, at a

minimum, the following statutory requirements: (1) the application is made by a foreign or international tribunal or any interested person; (2) the person from whom discovery is sought resides or is found within the district; (3) the discovery is for use in a proceeding before a foreign or international tribunal. *See* 28 U.S.C. § 1782. *See also Intel*, 542 U.S. at 264-65 (holding the burden is on the applicant to demonstrate a subpoena pursuant to Section 1782 should issue); *In re Mesa Power Group, LLC*, No. 11-280, 2012 WL 6060941, at *3 (D.N.J. Nov. 20, 2012) (identifying statutory requirements applicant must meet to obtain discovery under Section 1782).

Even where these basic requirements are met, the decision to authorize discovery pursuant to Section 1782 lies within a court's broad discretion. *Intel*, 542 U.S. at 264. "[A] district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so." *Id. See also In re O'Keeffe*, 646 F. App'x 263, 265-66 (3d Cir. 2016) (holding that, in deciding a Section 1782 application, a court first determines whether the statutory requirements are met and then evaluates whether to authorize the discovery as a matter of its discretion). In *Intel*, the Supreme Court identified four factors informing this discretionary decision: "(1) whether the evidence sought is within the foreign tribunal's jurisdictional reach, and thus accessible absent section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the request conceals an attempt to circumvent foreign proof gathering restrictions or other policies of a foreign country or the United States; (4) whether the subpoena contains unduly intrusive or burdensome requests." *O'Keeffe*, 646 F. App'x at 266 (citing *Intel*, 542 U.S. at 264-65).[6]

[6] In a decision pre-dating *Intel*, the Third Circuit described Section 1782's prima facie elements as "modest" and thus, consistent with a liberal interpretation of the statute, held once these elements are met,

An order authorizing discovery under Section 1782 may be issued on an *ex parte* application, without prejudice to the subpoenaed party's right to file a motion to vacate the order and/or quash the subpoena. *See Mesa Power Group*, 2012 WL 6060941, at *4. *See also In re Letter Request from Supreme Court of Hong Kong*, 138 F.R.D. 27, 32 n. 6 (S.D.N.Y. 1991) (noting *ex parte* process to obtain an order authorizing discovery under Section 1782 is justified by the fact that "the parties will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it."). And, the Third Circuit has held that "Section 1782 … incorporates by reference the scope of discovery permitted by the Federal Rules of Civil Procedure." *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 192 (3d Cir. 1999). *See also In re Ex Parte Global Energy Horizons Corp.*, 647 F. App'x 83, 85-86 (3d Cir. 2016) ("Section 1782 expressly incorporates the Federal Rules of Civil Procedure, and the fourth [*Intel*] factors aligns with Rules 26 and 45.").

Thus, upon motion brought by the subpoena respondent, the Court may quash or modify a subpoena issued pursuant to Section 1782 upon consideration of the *Intel* discretionary factors and/or in view of the Rules applicable to discovery. *See Mesa Power Group*, 2012 WL 6060941, at *3; *In re Lazaridis*, 865 F. Supp. 2d 521, 523 (D.N.J. 2011) (entertaining motion to quash subpoena initially authorized under Section 1782, noting "because the application was made *ex parte*, the Court allowed the Subpoena to be served but reserved judgment as to the

---

"district courts should treat relevant discovery materials sought pursuant to Section 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998). Even so, the Circuit noted whether to grant an application under Section 1782 was a matter for a court's discretion. *Id.* at 195-96. Indeed, as noted by former Chief Judge Wolfson, the Third Circuit made clear that "while section 1782 was enacted to 'facilitate the conduct of litigation in foreign tribunals, improve international cooperation in litigation, and put the United States into the leadership position among world nations,' *In re Bayer AG*, 146 F.3d at 191-92, 'these goals do not in turn mean that a party in foreign litigation is entitled to unbridled and unlimited discovery under the statute.' *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999)." *Cal. State Teachers Ret. Sys. v. Novo Nordisk, Inc.*, No. 19-16458, 2020 WL 6336199, at *5 (D.N.J. Oct. 29, 2020).

propriety of the substance of the Subpoena under the [applicable] discretionary factors"). The Court's exercise of discretion in considering whether to permit discovery under Section 1782 is not boundless, but rather must be guided by the statute's goals of "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *Schmitz v. Bernstein Liebhard & Lifshitz LLP*, 376 F.3d 79, 84 (2d Cir. 2004). Thus, "'[t]he *Intel* factors are not to be applied mechanically,'" and no single factor is dispositive or due more weight than the others. *In re Alpine Partners (B.V.I.) LP*, Civ. No. 24-337, 2024 WL 4336824, at *3 (D.N.J. Sept. 27, 2024) (quoting *Kiobel v. Cravath Swaine & Moore, LLP*, 895 F.3d 238, 245 (2d Cir. 2018)).

**B. Analysis**

In his motion to quash, Jacob does not challenge this Court's conclusion that Perry's application for discovery satisfies the statutory requirements under Section 1782, as set forth in the November 25, 2025 Order. However, he argues the *Intel* factors militate strongly against enforcing the Jacob Subpoena, characterizing her application as an impermissible request for production of SFPF documents from their New Jersey-based custodian after Perry has already tried and failed to obtain the material directly from Solid and SFPF in the foreign proceedings. Jacob's motion to quash contends that Perry's application amounts to an attempt to circumvent the March Decision and the imminent ruling by the Curaçao Court of Appeal.

In opposition, Perry does not dispute that the documents sought in these Section 1782 Proceedings overlap with those she requested in the Summary Proceeding or that the Curaçao Court denied that request. Rather, she argues that because the March Decision was issued upon a very broad request and based on a very limited record, her subsequent application to this Court to obtain a discrete set of documents from Jacob—a non-party to either the March Decision or the

Curaçao Damages Proceeding—does not constitute circumvention of foreign proof gathering restrictions. She stresses that discovery pursuant to Section 1782 is not precluded simply because it could not be obtained under the foreign jurisdiction's rules.

As all four *Intel* factors have been placed at issue, the Court considers each in turn.

Factor 1: whether the evidence sought is within the foreign tribunal's jurisdictional reach

The Supreme Court has held that "when the person from whom discovery is sought is a participant in the foreign proceeding … the need for § 1782(a) aid is generally not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. When the respondent is a participant in the foreign proceeding, Section 1782 discovery in the United States is less critical, "because a foreign tribunal has jurisdiction over those appearing before it and can itself order them to produce evidence." *Id.* at 264.

Jacob is not a party to the proceedings in the Curaçao Court, and as resident of New Jersey, he would appear to be beyond that foreign tribunal's jurisdictional reach. Moreover, Jacob has not refuted Perry's assertion that the records she seeks are in his possession. Superficially, the first *Intel* factor favors Perry's pursuit of discovery from him under Section 1782.

However, the list of documents demanded from Jacob, whether in its original form or as subsequently pared down by Perry through the meet and confer process, consists of records pertaining to transactions, communications, and contracts involving SFPF and/or Solid. In other words, while nominally directed to Jacob, the Jacob Subpoena in fact seeks records belonging to SFPF and/or Solid, entities that are parties to the Curaçao Damages Proceeding. "[W]hen the real party from whom documents are sought ... is involved in foreign proceedings, the first *Intel* factor counsels against granting a Section 1782 petition." *Kiobel*, 895 F.3d at 245. *See also SPS*

*Corp I, Fundo de Investimento em Direitos Creditórios Não Padronizados v. General Motors Co.*, 110 F.4th 586, 592 (3d Cir. 2024) (finding that, in analyzing first *Intel* factor, the district court properly considered that documents sought from a U.S. corporation located in Delaware were also in the possession of its foreign subsidiary, a party to the foreign litigation); *Frasers*, 2024 WL 139488, at *3 (finding first *Intel* factor weighed against enforcing document subpoena for a company's records maintained in the individual respondent's custodial file, reasoning that, although the individual respondent was not a party to the foreign proceeding, the company that employed her was).

Here, the Curaçao Court's authority extends to SFPF and Solid, the real parties from which the documents are sought. Notwithstanding the custodial file's physical presence in New Jersey, the discovery at issue in the Jacob Subpoena appears to be within the foreign tribunal's jurisdictional reach. Indeed, Perry has sought production of the documents directly from SFPF and Solid through proceedings brought in the Curaçao Courts, including the Summary Proceeding and the Curaçao Damages Action, and the March Decision's denial of her request was based on the applicable discovery standard there, not on the Curaçao Court's lack of jurisdiction to order their production. Thus, on one hand, the first *Intel* factor would seem to weigh against enforcing the Jacob Subpoena.

On the other hand, the circumstances here are different from those present in other cases in which the first *Intel* factor weighed strongly against Section 1782 assistance. For example, in *Kiobel*, the Second Circuit concluded the district court erred in granting a Section 1782 petition for various reasons, including its application of the *Intel* factors, but there, the petitioner sought documents for use in a Netherlands litigation against a corporation from the New York-based law firm that had represented the corporation in an earlier, American action. *Kiobel*, 895 F.3d at

243-245. The *Kiobel* respondent was not a party to the foreign litigation, whereas the true target of the discovery request was, and it held the documents only by virtue of previously serving as the corporation's counsel. In *Frasers*, this District found the first *Intel* factor weighed against ordering a corporation's file custodian, who resided in New Jersey, to produce documents under Section 1782, but noted the corporation had been forthcoming with documents in the foreign proceeding, agreed to search all records, and agreed it would "not raise jurisdictional objections … [or] object to producing any business records located in [the custodian's] personal devices or files." *Frasers*, 2024 WL 139488, at *3. In contrast, Perry does not seek documents from SFPF's or Solid's legal counsel, and although the records may actually belong to parties involved in foreign proceedings, those parties have thus far resisted turning them over to Perry.

For these reasons, while the Curaçao Court's authority over SFPF and Solid points to disallowing the discovery sought in the Jacob Subpoena, this first *Intel* factor concerning the foreign court's jurisdictional reach is not especially instructive on the question of whether Section 1782 assistance is appropriate in this case.

<u>Factor 2: whether the foreign tribunal is receptive to U.S. judicial assistance</u>

Courts considering Section 1782 petitions generally view the second *Intel* factor as favoring discovery unless there is "authoritative proof that the foreign court would reject the evidence." *See In re O'Keeffe*, No. 14-5835, 2015 WL 540238, at *4 (D.N.J. Feb. 10, 2015) (citing *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir.1995)), *affirmed by* 646 F. App'x 263 (3d Cir. 2016). *See also In re Hopkins*, No. 20-mc-80012, 2020 WL 733182, at *3 (N.D. Cal. Feb. 13, 2020) (citing cases illustrating that courts find a lack of receptivity "where the foreign tribunal or government expressly states it does not want the assistance of a United States federal court under Section 1782."). In that regard, the receptivity question may be

informed by the foreign proceeding's history and any pertinent orders issued by the foreign court. *See SPS Corp I*, 110 F.4th at 593 (holding that the question of foreign receptivity may overlap with the third *Intel* factor, inquiring whether the Section 1782 request conceals an attempt to circumvent a foreign proof-gathering restriction).

Here, the Curaçao Court has neither expressly nor implicitly indicated it would reject the documents Perry seeks from Jacob through this Section 1782 process. First, nothing before the Court indicates Curaçao is not generally receptive to evidence gathered under Section 1782. *See, e.g., In re Caterpillar Crédito*, No. 22-mc-00273, 2023 WL 6938264, at *10 (S.D.N.Y. Oct. 20, 2023) (granting Section 1782 application for discovery for use in proceedings before the Curaçao Court). Second, although Jacob has argued the March Decision makes clear the Curaçao Court has ruled Perry does not have a right to access the various SFPF and Solid documents, that decision does not, standing alone, demonstrate that the Curaçao Court would not be receptive to foreign discovery. The March Decision was based on Perry's failure to meet the standard for ordering SFPF and Solid to turn over various documents under Article 843a, in large part because she had failed "to make it sufficiently plausible that the alleged legal relationship exists" such that the correct balance could be struck between Perry's interest in the evidence and SFPF's and Solid's interest "in not having to disclose confidential information and remaining free from a drastic measure." Kennedy Decl. Ex. 1 at 9. However, that finding was made on a limited record at a very early stage of Perry's proceedings against SFPF and Solid in the Curaçao Court, and nothing in the March Decision suggests that a different outcome would be impossible based on additional information. In fact, the March Decision stated that, although Perry claimed her interests in SFPF and Solid had been harmed by allegedly unlawful actions taken by those entities, the Curaçao Court stated "this was not sufficiently shown in the context

of these preliminary proceedings." *Id.* at 10. Third, insofar as Jacob has argued that the foreign tribunal would not be receptive given its imminent decision on the Consolidated Appeal, including specifically Perry's claim for production of the documents, the procedural posture of the foreign proceedings cannot be construed as a clear indication that the documents Perry might obtain through Section 1782 would be rejected. To the contrary, the Curaçao Court of Appeal expressly stated in the June 16, 2026 hearing that, while it was possible to raise legal objections to the Section 843a claim, a practical solution entailed "giving those documents to Yael" and urged SFPF and Solid to "take the approach of practicing maximum transparency." Barten Decl. Ex. A at 9.

In view of the general approach to assessing a foreign tribunal's receptivity to U.S. judicial assistance and the specific record of Perry's proceedings in Curaçao, this Court finds that the second *Intel* factor favors providing Perry with the documents she seeks from Jacob.

<u>Factor 3: whether the applicant is attempting to circumvent proof-gathering restrictions in foreign or American courts</u>

The record of proceedings in Curaçao also informs this Court's consideration of whether Perry's pursuit of discovery under Section 1782 is intended to circumvent that foreign jurisdiction's proof gathering restrictions. *Frasers*, 2024 WL 139488, at *3 (noting that, in the context of analyzing the third *Intel* factor, the Court may inquire into the Section 1782 applicant's efforts to obtain the information in the foreign jurisdiction and "a perception that an applicant has side-stepped less-than-favorable discovery rules by resorting immediately to § 1782 can be a factor in a court's analysis.") (internal quotation omitted). As he argued with respect to the second *Intel* factor, Jacob maintains that because Curaçao has already denied Perry's request for the documents she seeks through the Jacob Subpoena, Perry has in essence asked this Court to make a determination directly at odds with the March Decision, thus

creating a situation that "would undermine finality, encourage parties to attempt to circumvent adverse foreign rulings, and generate inefficiency." *SPS Corp I*, 110 F.4th 594. Jacob further argues that, in view of the pending appeal of the Mach Decision, Perry's request for recourse under Section 1782 essentially asks this Court to interject itself into the Curaçao Court of Appeal's proper role and is thus at odds with principals of comity. In short, he maintains Perry's Section 1782 application is an unvarnished attempt to circumvent an unfavorable ruling abroad. *See id.* (reviewing a district court's denial of a Section 1782 application and noting "the circumvention factor applies 'when the foreign tribunal has already rejected requests for the same documents.'").

In response, Perry acknowledges the March Decision was unfavorable but tries to minimize its impact, arguing that a single order made on a preliminary request does not amount to a proof gathering restriction. And, she maintains her Section 1782 application did not conceal her unsuccessful attempt to obtain the discovery through the Curaçao Court because it informed this Court that she had made a request for documents in the Summary Proceeding. *See* Perry Decl. ¶ 14. Perry points out that Courts considering petitions for assistance under Section 1782 tend to look with disfavor on petitioners who have not attempted to obtain the discovery through the foreign jurisdiction's procedures and, moreover, that it is precisely in situations like this one, where the discovery could not be obtained in the foreign proceedings, that Section 1782 serves its proper purpose.

Determining whether Perry's discovery request amounts to a circumvention attempt requires a close examination of both the record here and in the Curaçao Courts. Jacob is correct that, while Perry's initiation of the Summary Proceeding in Curaçao is disclosed in her Section 1782 Petition, Perry did not make clear that the Summary Proceeding resulted in a denial of her

request for largely the same documents she sought from Jacob. It is also beyond dispute that the March Decision is currently under consideration by the Curaçao Court of Appeal. However, it is equally true that, since the time of the March Decision, the Curaçao Court has made clear that, SFPF and Solid have been unjustifiably withholding information from Perry. In the December Decision, the Curaçao Court sharply chided SFPF and Solid, and by extension their director Jacob, for a lack of transparency toward Perry, particularly regarding matters involving the MSA. Additionally, though it stopped short of issuing a ruling on the consolidated appeal, the Curaçao Court of Appeal unambiguously encouraged SFPF and Solid to produce the documents at issue in the March Decision, notwithstanding the applicable discovery rules in that jurisdiction.

Those developments in the Curaçao proceedings distinguish the circumstances here from those presented in *SPS Corp I*, a Third Circuit decision on which Jacob relies heavily in support of his circumvention argument. There, the petitioner SPS Corp I, an assignee of numerous Brazilian car dealerships, filed a Section 1782 petition seeking documents from U.S. auto manufacturer General Motors ("GM") for use in the petitioner's suit against the manufacturer's subsidiary GM Brazil to recover the value of tax overpayments made by the dealerships. *See SPS Corp I*, 110 F.4th at 589. However, because a separate action had been brought by GM Brazil against Brazil's tax authority, the Brazilian court had already concluded that SPS Corp I lacked standing to sue GM Brazil while the tax authority reviewed the overpayment calculations. *Id.*

Notwithstanding its lack of standing on the merits, SPS Corp I began to pursue discovery from GM Brazil, initiating a preliminary proceeding for documents in a Brazilian court. *Id.* at 590. While that proceeding was pending, SPS Corp I filed a Section 1782 petition

in the District of Delaware for authorization to propound discovery on GM. *Id.* The petition was denied by the District Court based on the *Intel* factors, in view of the pendency of the foreign discovery proceedings, and thereafter, the discovery request made in the Brazilian court was also denied. *Id.* On appeal, the Third Circuit affirmed the District Court's decision on SPS Corp I's Section 1782 petition, finding it did not abuse its discretion in analyzing the *Intel* factors. *Id.* 594-95. In relevant part, the Third Circuit held that the District Court properly considered the Brazilian court's order barring substantially the same discovery as an indication that the foreign jurisdiction would not be receptive to foreign-gathered evidence and, moreover, reasonably concluded that a contrary decision by an American court would encourage circumvention of adverse rulings by foreign courts. *Id.* at 594.

There are undoubtedly similarities between this case and *SPS Corp I*, particularly insofar as both involve a request for discovery under Section 1782 where a foreign court has issued an adverse order disallowing that discovery. However, in *SPS Corp I*, the Third Circuit noted the foreign court had "thus far erected a solid wall against SPS's attempts to pursue GM Brazil and none have indicated receptivity to American discovery." *Id.* Here, in contrast, Perry's merits-based action, the Curaçao Damages Proceeding, remains active and ongoing, and proceedings subsequent to the adverse, preliminary discovery ruling reveal the Curaçao Court's support for SFPF's and Solid's disclosure of documents to Perry.

Under these factual circumstances, Jacob has not demonstrated that Perry's pursuit of documents in his possession for use in the Curaçao proceedings would amount to circumvention of that foreign jurisdiction's proof-gathering restrictions. Section 1782 does not impose foreign discoverability as an element of seeking the assistance of U.S. courts with discovery for use abroad. *See Intel*, 542 U.S. at 253. *See also Kulzer v. Esschem*, 390 F. App'x 88, 92 (3d Cir.

2010) (observing that although Germany's civil procedure was far more restrictive than American pretrial discovery rules, such restriction did not weigh against seeking documents under Section 1782). Nor does it require an applicant to exhaust a foreign tribunal's fact gathering process before seeking relief under the statute. *See, e.g., In re Bayer AG*, 146 F.3d at 195-96 ("a quasi-exhaustion requirement … has been rejected by those courts that have addressed it."). Consistent with the foregoing principles, the Third Circuit has stated that "adverse discovery rulings by foreign courts are not necessarily fatal for § 1782 applicants." *SPS Corp I*, 110 F.4th at 594. Applying these tenets to the factual record here, the Court cannot conclude that Perry's unsuccessful attempt to obtain the documents in Curaçao forecloses the assistance available under Section 1782 or that this application indicates an abuse of that statutory mechanism.[7]

Thus, the third *Intel* factor does not militate in favor of Jacob's motion to quash.

Factor 4: whether the request for discovery is unduly intrusive or overly broad

The fourth *Intel* factor "aligns with Rules 26 and 45" of the Federal Rules of Civil Procedure. *In re Ex Parte Glob. Energy Horizons Corp.*, 647 F. App'x 83, 85-86 (3d Cir. 2016). Thus, discovery requested under Section 1782 must be relevant and proportional, pursuant to Rule 26, and must be designed "to avoid imposing undue burden or expense on a person subject to the subpoena," as required by Rule 45. *Id.* at 86. If the discovery requests do not comply with these Rules, they "may be rejected or trimmed." *Intel*, 542 U.S. at 265.

[7] In other words, notwithstanding the impediments encountered in the foreign tribunal, Perry may seek the discovery here, and this Section 1782 application does not offend notions of comity merely because her appeal from the March Decision remains pending. That appeal may result in an order either reversing the adverse ruling on Perry's records request or, alternatively, concluding the Curaçao Court correctly found she failed to meet the standard for ordering disclosure under Curaçao's discoverability rules. Neither outcome alters the Court's analysis here.

Jacob argues Perry's document demand is overbroad and unduly burdensome because the theory underlying the Curaçao Damages Proceeding, the action for which Perry seeks the discovery, has been rejected by the Curaçao Court's December Decision denying her request to oust Jacob as SFPF's director. Specifically, Jacob notes the December Decision rejected Perry's mismanagement claim against Jacob based, in part, on its finding that SFPF's entry into the BNC Agreement did not require her approval. He argues this finding necessarily depended on the conclusion that the BNC Agreement did not constitute a distribution of SFPF's funds meant for her benefit, and as such, refutes the basis for her claim for unlawful dissipation of assets asserted in the Curaçao Damages Proceeding.

The Court finds this argument unpersuasive. Despite Jacob's argument that Perry's claims in the Curaçao Damages Proceeding have been essentially undermined, that lawsuit remains pending. It is difficult for this Court to conclude, or even surmise, what effect the December Decision's findings, made in the context of Perry's petition to remove Jacob from his management role in SFPF, might have on her separate action to recover damages.

Moreover, in opposition to the motion to quash, Perry proposes narrowing the Jacob Subpoena to six discrete documents. Opp'n Br. at 3, 20-21, citing Kennedy Decl. Ex. 4. That reduced list consists of the following: (1) Solid NV loan agreement; (2) Pledge agreement securing Solid NV loan; (3) SFPF loan agreement; (4) Directors' undertaking for Solid NV; (5) Share transfer of SFPF shares to BNC; and (6) Buford Promissory Note. See Kennedy Decl. Ex. 4. Perry identifies those documents as annexes to the MSA consisting of agreements and corporate records related thereto and states that each was electronically signed by Jacob. She argues the documents are relevant and necessary to her claims against SFPF and Solid for the improper transfer of funds to which she is a beneficiary. She further argues that Jacob's refusal,

in his capacity as a director of SFPF, to provide her the documents is particularly unjustified in view of the fact that all other SFPF beneficiaries have access to the records. Jacob does not refute these assertions, nor does he challenge the relevance or proportionality of the six documents in Perry's reduced list.

As annexes to the MSA, the documents appear to be relevant Perry's claims in the Curaçao Damages Proceeding and proportionate to the needs of that case. For the reasons discussed, Jacob fails to demonstrate the production would be unduly burdensome. The Court finds that, as narrowed by Perry, the discovery request complies with Rules 26 and 45, thus supporting enforcement of the Jacob Subpoena as to the six documents listed above.

Therefore, the fourth *Intel* factor supports discovery.

## III. Conclusion

Perry's discovery request, as set forth in the Jacob Subpoena, indisputably meets Section 1782's criteria. However, as held by *Intel* and its progeny, whether to grant such a request, or as is the case here, enforce a subpoena authorized under the statute, remains a matter of the Court's discretion. In applying the *Intel* factors to Jacob's motion to quash, this Court has aimed to strike a balance between its concern with avoiding interference in a foreign court's evidence gathering process and fulfilling the "consistently liberal interpretation" afforded to Section 1782 to meet its objective of "'assist[ing] foreign tribunals in obtaining relevant information that the tribunals may find useful but, for reasons having no bearing on international comity, they cannot obtain under their own laws.'" *Kulzer*, 390 F. App'x at 92 (quoting *Intel*, 542 U.S. at 262). Under the totality of circumstances, as discussed above, this Court concludes that granting Perry's narrowed request for production directed to Jacob does not threaten to usurp the Curaçao Court's authority and, in view of that Court's comments concerning the need for

transparency by SFPF and Solid toward Perry, may indeed facilitate the resolution of foreign dispute. In short, in its discretion, the Court finds that discovery in aid of foreign litigation is warranted and appropriate.

Therefore, consistent with the foregoing analysis and Perry's narrowed request for production of six discrete documents, the Jacob Subpoena will be quashed in part and enforced in part.

Accordingly,

**IT IS** on this 29th day of October 2026,

**ORDERED** that Jacob's motion to vacate and quash subpoena [D.E. 26] is **GRANTED IN PART AND DENIED IN PART**; and it is further

**ORDERED** that the Court's November 25, 2025 Order authorizing the Jacob Subpoena remains in force but the Jacob Subpoena it authorizes is partially quashed; and it is further

**ORDERED** that Jacob shall respond to the Jacob Subpoena insofar as it seeks the following documents: (1) Solid NV loan agreement; (2) Pledge agreement securing Solid NV loan; (3) SFPF loan agreement; (4) Directors' undertaking for Solid NV; (5) Share transfer of SFPF shares to BNC; and (6) Buford Promissory Note; and it is further

**ORDERED** that such documents shall be produced no later than November 20, 2026.

/s/ *André M. Espinosa*
ANDRÉ M. ESPINOSA
United States Magistrate Judge